Paul J. Hickey (5-1431)
Hickey & Evans, LLP
1800 Carey Ave., Suite 700
P.O. Drawer 467
Cheyenne, WY  82003
Telephone: (307) 634-1525
Facsimile: (307) 638-7335

Alan L. Sullivan (*Pro Hac Vice*)
Jared C. Fields (*Pro Hac Vice*)
Snell & Wilmer L.L.P.
15 West South Temple, Suite 1200
Gateway Tower West
Salt Lake City, Utah  84101-1531
Telephone:  (801) 257-1900
Facsimile:  (801) 257-1800

Attorneys for Plaintiff

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| Northwest Pipeline GP, a Delaware general partnership,<br><br>           Plaintiff,<br><br>vs.<br><br>Chevron Mining Inc., a Missouri corporation, and Westmoreland Kemmerer, Inc., a Delaware corporation,<br><br>           Defendants. | **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING PLAINTIFF'S DAMAGES RELATING TO THE 30-INCH PIPELINE**<br><br>Case No. 2:12-cv-00021-NDF |

Plaintiff Northwest Pipeline GP ("Northwest") respectfully submits this memorandum in opposition to defendants' Motion for Partial Summary Judgment Regarding Plaintiff's Damages Relating to the 30-Inch Pipeline (August 14, 2013) (the "Motion").

## SUMMARY

This case relates to Northwest's 2011 relocation of two natural gas pipelines under emergency circumstances occasioned by cracks emanating from the crest of Defendant's Chevron Mining Company's Kemmerer Mine. To avoid what Chevron represented as an imminent risk of catastrophic collapse of the land in which the pipelines were located, Northwest spent millions of dollars to move the pipelines to a location suggested and approved by the Defendants. One of Northwest's two pipelines had been in the same location since 1972, pursuant to an easement agreement which dedicated a 60-foot wide strip of land. The second pipeline was added in 2004 and was located within the original sixty-foot easement, but it received the additional protection of a new easement agreement conveyed by the fee owner of the property. The present Motion asks the Court to reverse its Order Denying Defendants' Partial Motion to Dismiss (March 30, 2012). There the Court held that (1) Chevron had a duty to provide lateral support for the 60-foot easement, including both pipelines installed with the easement (2) Chevron lacks standing to object to the presence of the second pipeline in the easement; and (3) Chevron's rights were acquired subject to the duty to protect both pipelines under the Surface Mining Control and Reclamation Act, 30 U.S.C. § 1270(f) (hereinafter "SMCRA").

There is no basis for the Court to reverse its prior ruling. Although the parties have conducted substantial discovery in the time since the Court considered the Partial Motion to Dismiss, the facts relevant to this issue were fully considered by the Court in that ruling and have not changed. The Court considered the relevant easement documents in full, and those documents and controlling law are dispositive. The Court should deny the Motion for three reasons.

<u>First</u>, the Motion is untimely. Since the Motion relates exclusively to the issue of liability, Chevron was required to file it by February 1, 2013. The Defendants' characterization of their

17843895.1

Motion as one relating to "damages" associated with the second pipeline, and their reference to a snippet of testimony from Northwest's designated deponent on damages, are a pretext to excuse Chevron from the relevant deadline. The validity of Northwest's rights against Chevron is the central liability issue in this case, and it cannot plausibly be characterized as a damages issue.

<u>Second</u>, although the Motion is based primarily on Chevron's assertion that Northwest lacked Chevron's "permission" to place the second pipeline, it is clear that Chevron consented to the additional pipeline. In fact, Chevron granted Northwest permanent pipeline easements in 2003 to allow Northwest to place its 30-inch pipeline on the parcels adjacent to the particular parcel at issue in this case. Northwest obtained its easement on the parcel that is the subject of this case from the fee owner of the property, Anadarko Land Company, from which Chevron leases the mineral estate. As the discovery record shows, Chevron was aware of the addition of the 30-inch pipeline and agreed to cooperate in its installation. At a minimum, there are disputed fact issues regarding whether Chevron granted permission to place the second pipeline.

<u>Third</u>, even if Chevron had not granted permission to install the second pipeline, the pipeline was located within the footprint of the original easement and was thus subject to the same protections from interference as the first pipeline. Those protections arise under federal law and the common law right to lateral support. They apply with equal force to both pipelines, and Chevron is equally liable for the relocation costs attributable to both pipelines in the system.

## **FACTS**

In response to the Statement of Undisputed Facts offered by the Defendants at pages 3 through 9 of their Motion, Northwest submits the facts set forth below. To the extent any proffered fact in the Defendants' memorandum is deemed admitted because it is not expressly addressed herein, it is admitted for purposes of this Motion only. *See* Fed. R. Civ. P. 56(e)(2).

1. Northwest admits that it operates an interstate natural gas pipeline system consisting of two parallel pipelines, compressor stations, and ancillary facilities.

2. Northwest admits that defendant Chevron Mining, Inc. ("Chevron") and its predecessors conducted coal mining operations at the Kemmerer Coal Mine for nearly three decades, and that Chevron sold the mine to defendant Westmoreland Kemmerer, Inc. ("Westmoreland") effective January 1, 2012.

3. Northwest admits that it alleges in this action that Northwest alleges that "as the result of cracks and earth movement emanating from the northern wall of the Kemmerer Coal Mine, the pipeline system [became] subjected to dangerous levels of stress." (Amended Complaint, ¶ 16). Northwest also admits that it "(a) built a temporary pipeline about 400 yards from the mine, and (b) relocated the 26-inch and 30-inch pipelines about a mile from the mine." (*Id.* ¶ 20). It further admits that in this action, "Northwest is now seeking to recoup associated costs from Defendants."

4. Northwest admits that a 1972 Deed from Union Pacific Land Resources Corporation to Northwest's predecessor-in-interest conveyed a perpetual easement "for the construction, operation, maintenance, repair, renewal, reconstruction, and use of a 26-inch gas pipe line along, upon, and under the surface of [a 60-foot wide strip of land]." (Motion at 4.)

5. Northwest admits that the 1972 Deed includes the following language, but disputes Chevron's legal interpretation and Chevron's characterization of testimony regarding its meaning:

> The grant of easement herein made is on the express condition that the party of the first part, its successors and assigns shall not be liable to the party of the second part, its successors or assigns for any damage occurring to the installations made or to be made by the party of the second part upon the land herein granted in easement or for any other damage whatsoever occasioned by subsidence of the surface of said land as a result of mining underneath the same or resulting in any other way from the removal of coal or other minerals in or underlying the above-described land.

4

Contrary to Chevron's arguments, the foregoing provision did not waive Northwest's right to lateral support. Rather, the provision waives claims arising "as a result of mining <u>underneath the [easement]</u> or resulting . . . from the removal of coal or other minerals <u>in or underlying the above-described land</u>." (Emphasis added). The historic record produced by Chevron shows that this provision was designed to govern liability for damage resulting from the presence of underground mines <u>directly below or within</u> the easement. In other words, the parties to the 1972 Deed were concerned about the risk of subsidence from abandoned underground mines, not from surface mining operations. The "Twin Creeks" area of the Kemmerer Mine took its name from two historical underground mines, the first of which "was opened in 1881 on the south side of today's U.S. Route 30," and the second which "opened in 1882 on the north side of today's U.S. Route 30." *See* Rosenberg, Sanders & Penny, THE TWIN CREEKS COAL CAMP AND MINES, August 1989 (submitted as part of Chevron's Mine Plan and attached hereto as Exhibit A) at CHEV_Northwest 0000789. These underground mines, located in the immediate vicinity of the easement at issue in this case, "had a short production history of only four years." Decades later, the underground mines were "worked on a limited basis" by a one-horse operation from approximately 1932 until their closure in about 1937. *Id.* at CHEV_Northwest 0000789, 796. The most plausible interpretation of the term "in or underlying" the easement area is that it referred to the legacy risk of subsidence due to abandoned underground mines. It has no application to lateral failures resulting from surface mining operations on adjacent parcels. In fact, it has no application to surface mining at all, because surface mining "in or underlying the above-described land," that is, the easement, would have been prohibited after the installation of the pipelines.

Northwest's Rule 30(b)(6) deponent did not testify to the contrary. Over objections from Northwest's counsel, Chevron's counsel asked the witness to offer a legal conclusion on the legal meaning of the 1972 Deed, which was negotiated more than 40 years ago by the parties'

5

17843895.1

predecessors in interest. Counsel asked whether it was "Northwest's understanding that if there was subsidence around the pipeline, that you could not look to Union Pacific for any damage occasioned by that subsidence?" (Ex. B to Motion at 190:13-16.) Following Northwest's objections, the witness stated "[i]t says that shall not be liable to the party of the second part, yes." (*Id.* at 190:18-19.) This answer does not impose on Northwest any broader disclaimer of liability than the plain text of the 1972 Deed.  The Rule 30(b)(6) deponent did not agree to Chevron's unfounded legal position that this language was designed to eliminate any liability for harm caused by surface mining on adjacent parcels. To the extent that is Chevron's position, it is disputed both factually and legally.

6. Northwest also admits that in addition to the easement created by the 1972 Deed, Northwest acquired an overlapping 75-foot wide permanent easement from the current fee owner of the property, Anadarko Land Corporation, in November 2004 (the "2004 Agreement"). Northwest obtained the easement under the 2004 Agreement when it added the 30-inch pipeline to its system.  The exhibits to the 2004 Agreement (Ex. C to Motion) show that the second pipeline, at least in the section of the system relevant to this dispute, runs within the confines of the original 1972 easement.  The overlapping nature of Northwest's easements is clear from Exhibit "C" to the 1972 easement, which shows a "Permanent Easement Detail" in which the new pipeline runs parallel to, at a distance of 20 feet from, the original pipeline.

7. Northwest admits that in 1983, "Chevron, through its predecessors-in-interest," acquired coal mineral rights in a number of parcels, including the parcel over which the relevant portion of Northwest's pipeline easement ran. (Motion at 6.) However, under the 1983 Special Warranty Deed, defendants' right to extract coal was explicitly made subject to Northwest's preexisting rights under the 1972 Deed and any and all restrictions and limitations imposed by public authority.  Specifically, the 1983 Special Warranty Deed stated that the deed was "made· SUBJECT to the following: . . . (e) Any and all restrictions and limitations imposed by public

6

authority, and any easements, restrictions and/or outstanding rights of record . . . including, without limiting the same, those instruments identified on Exhibit C hereto attached and hereby made a part hereof." (Ex. D to Motion, at 3.) The 1972 Deed was expressly identified in the exhibit to the 1983 Special Warranty Deed, and its terms therefore limited the scope of the rights granted under the 1983 Special Warranty Deed. (Ex. D to Motion, at Ex. C).

Among the "restrictions imposed by public authority" are statutes and rules regulating surface mining operations. Defendants' operation of the Kemmerer Mine was, and remains, subject to regulation under SMCRA and the state statute and regulations adopted thereunder. Under the Wyoming Act, Wyo. Stat. Ann. §35-11-406(b)(xiii), Chevron had the obligation to adopt mining procedures that would "avoid constituting a public nuisance, endangering the public safety . . .[or] property . . . in or adjacent to the permit area." (*Id.*, ¶ 28.) Under other provisions of the Wyoming Act, *id.* § 35-11-415(b)(xi)(C)(II), Chevron had the obligation to avoid any use of explosives that would "damage property outside the permit area." (*Id.*) Under regulations adopted by the Wyoming Department of Environmental Quality pursuant to SMCRA and the Wyoming Act, Chevron had the obligation to "minimize damage, destruction, or disruption of services" provided by natural gas pipelines that are not part of the surface coal mining operation. Code of Wyo. Rules § 020-040-004(2)(x).

8. Northwest disputes the Defendants' statement that Chevron received the right to mine coal "without being required to leave or provide subjacent and lateral support for the surface." (Motion at 6.) Because Chevron acquired its rights subject to Northwest's existing rights under the 1972 Deed, Chevron cannot ignore Northwest's right to lateral support.

9. Northwest disputes the Defendants' assertion that "in 2003, when Northwest added the 30-inch pipeline, it did so without requesting permission from the owner of the mineral estate and the surface rights, Chevron." (Motion at 8.) The discovery record shows not only that

7

Chevron was aware of the installation of the 30-inch loop line 2003, but that it granted Northwest easements in order to facilitate the pipeline's installation.

In February 2003, Northwest recorded a "Non-Exclusive Right-Of-Way and Easement" from Pittsburg & Midway Coal Mining Co. (the prior name of Chevron Mining Inc.). *See* Exhibit B, attached hereto. In this instrument, Chevron conveyed a 75-foot permanent easement for Northwest's 30-inch pipeline over Chevron's fee lands in the immediate vicinity of the lands covered by the 1972 Deed. *Id.* at CHEV_Northwest 0003959; *Compare* Ex. B at CHEV_Northwest 0003959 to Motion Ex. D at NWP000007. Chevron conveyed a similar easement covering another Chevron-owned parcel immediately southeast of the lands covered by the 1972 Deed. *See* Exhibit C hereto. Chevron could not have missed the fact that the easements it conveyed to Northwest were part of the same pipeline system that ran within the 1972 Deed easement.

A month before the foregoing easements from Chevron were recorded, Northwest communicated with Chevron's Don Lamborn, who was the mine's chief environmental officer, concerning Northwest's plans install the segment of the new 30-inch pipeline within the 1972 Deed's easement in the area immediately to the north of the mine. Mr. Lamborn testified that he and his colleagues were consulted about and provided feedback regarding the installation of the 30-inch pipeline in this area. He testified, "I remember them [Northwest personnel] coming and installing [the new pipeline]. You know, we coordinated for the installation." *See* Depo. of Don Lamborn, excerpts attached as Exhibit D, at 105:3-8. He testified that he met with Northwest personnel to discuss the potential impact of Chevron's blasting operations on the new pipeline. *Id.* at 106:12-107:8. Mr. Lamborn testified that he "probably" had further involvement with Northwest after that meeting. *Id.* at 107:20. He stated: "I don't remember specifics. The pipe went in. I'm sure we were coordinated on it." *Id.* at 107:21-22.

Internal Chevron emails identified in Mr. Lamborn's deposition show that in January 2003 Northwest advised Chevron of the precise location of the new pipeline, sent maps of the location to Mr. Lamborn and others, obtained access to the easement area from Chevron to enable pipeline construction in the area nearest the mine, and otherwise asked for Chevron's cooperation in the installation of the pipeline. Chevron provided its cooperation and even made available a staging area for Northwest's construction equipment. *See* Exhibits E and F hereto (emails from N. Bettas to D. Lamborn et al., and from S. Johnson to D. Lamborn, marked as Exhibits 69 and 70 to the Lamborn Deposition.) The argument that Chevron failed to authorize Northwest's installation of the 30-inch loop line should be rejected.

Contrary to Chevron's Motion, Northwest's landman did not testify that Northwest installed the pipeline without requesting Chevron's permission. The cited portion of the transcript (which does not appear to be included with the excerpts submitted as Exhibit B to the Motion) is in fact a series of questions regarding discussions between Chevron and Northwest about voluntarily relocating the pipeline to accommodate mining operations north of Highway 30. *See* Depo. of Scott Patterson, excerpts attached as Exhibit G, at 91:2-95:4. Testifying in his individual capacity, Mr. Patterson stated that "it's highly likely that Chevron was advised because access would have been an issue." *Id.* at 95:15-17. Mr. Patterson also testified that he "would not have been involved" with any discussion directly with Chevron about obtaining permission to place the pipeline. *Id.* at 96:8-12. For Chevron's part, the Defendants offer no testimony or evidence from any Chevron witness to support the assertion that Northwest's installation of the 30-inch pipeline was unauthorized.

Finally, Northwest disputes legal conclusions attributed to "Chevron's property rights expert" because, as shown in Part 3 of the Argument below, her conclusions defy the language of the 1972 Deed, the protections afforded by federal and state surface mining acts, and the common law governing an easement holder's right to lateral support. This Court, not a title

9

examiner having no legal training, must rule on the law governing the parties' rights and obligations.

## ARGUMENT

Summary judgment is only appropriate if the record before the Court shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). As Defendants recognize, "the non-moving party is entitled to all reasonable inferences from the factual record, which is viewed in the light most favorable to the party opposing summary judgment." (Motion at 10 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

### 1. The Motion is Untimely.

In this case, the Court approved a bifurcated discovery and dispositive motion schedule, separately addressing issues of liability and damages. Under the Order Amending Pretrial Order, entered by the Court on July 16, 2012, the Court directed that "[t]he deadline for the parties to file all dispositive motions and *Daubert* challenges relating to liability questions, together with briefs and affidavits in support thereof, is February 1, 2013." The present Motion addresses the question whether Northwest may recover from Defendants. It does not address the amount of damages or the manner in which damages should be quantified. Since the Motion seeks a dispositive ruling on liability, it should have been filed by February 1, 2013.

The Motion's only attempt to refer to the question of damages consists of a citation to the testimony of Robert Peacock, Northwest's Rule 30(b)(6) damages deponent. *See* Motion at 8. Chevron's lawyer asked Mr. Peacock about Northwest's request that Westmoreland provide its consent to the permanent relocation of the pipeline, which consent was needed to secure expedited regulatory approval from the Federal Energy Regulatory Commission. Northwest's lawyer objected to the question because it had nothing to do with the issue of damages and was beyond the scope of Mr. Peacock's Rule 30(b)(6) deposition. More importantly, the testimony

elicited from Mr. Peacock has nothing to do with the issue presented in this Motion, whether the mineral rights holder has standing to object to the addition of a second pipeline within the footprint of an earlier easement.

In any event, Chevron's citation to testimony obtained during from the damages phase of discovery does not transform the character of this motion, which clearly relates to the question of liability. Since the Motion should have been filed before the February 1, 2013 deadline, it should be denied on that basis alone.

> **2.    Northwest's Placement of the 30-Inch Pipeline Is Not a Trespass and Was Authorized by both Chevron and the Fee Owner**.

In its earlier Partial Motion to Dismiss, Chevron "argue[d] that the 1972 Deed only authorized the 26-inch pipeline and it does not include the right to construct the second 30-inch pipeline[.]" (Order Denying Defendants' Partial Motion to Dismiss Plaintiff's Claims Relating to 30-Inch Pipeline, Doc. 34, at 10.) The Court rejected this argument holding that "Chevron is not the proper party to advance this argument." (*Id.*) The Court reasoned that "Chevron has never owned either the easement or the land it burdens, and Chevron identifies no law at this time to support the proposition that it can complain of Northwest's placement of a second pipeline on that 60-foot strip of land." (*Id.*) The undisputed facts are that Northwest received an easement from the fee owner of the relevant property and that its pipeline was placed within the original easement.

Presumably in response to the Court's earlier rulings, Chevron now argues that Northwest's placement of the second pipeline was a trespass. This argument should be rejected for at least three reasons.

First, Chevron has cited no authority to support the contention that the subsequent transferee of mineral rights (that is, Chevron) has standing to challenge the installation of a second pipeline as an excessive use of a previously existing easement. The easement itself was

conveyed to Northwest's predecessor by the fee owner, prior to the severance of the mineral estate. None of the authorities cited in Chevron's Motion addresses this situation.

Second, in claiming that it has standing to challenge Northwest's use of the 1972 Deed easement, Chevron ignores explicit limitations in its own chain of title. Although the 1983 Special Warranty Deed purported to convey the "exclusive and unlimited right to the use of the surface of the lands" necessary for coal mining activities, the conveyance was expressly subject to rights previously conveyed to Northwest's predecessor in 1972 Deed. (Ex. D to Motion.) Chevron's rights were not unlimited, as it argues. It could not mine coal from the land in the 60-foot easement strip. Since Chevron was required to respect Northwest's easement, the installation of a second pipeline within the easement did not "impact[] Chevron's mineral estate and exclusive surface use rights." (Motion at 11.) The easement conveyed in 1972 was conveyed by the fee owner, and the fee owner would be the only appropriate party to challenge Northwest's use of the easement. As the Court previously held, "Chevron is not the proper party to advance this argument." (Doc. 34 at 10.)

Third, the discovery record makes it clear that in 2003, Chevron consented to the installation of the 30-inch pipeline. "Consent of the possessor or another authorized to consent is an absolute defense to trespass." *Salisbury Livestock Co. v. Colorado Cent. Credit Union*, 793 P.2d 470, 475 (Wyo. 1990). As shown in the factual presentation at pages 7-9, above, Chevron granted Northwest essentially identical easements on adjacent parcels to allow installation of the 30-inch pipeline parallel to the 26-inch pipeline. Northwest's witness testified that Chevron was aware of the installation of the second pipeline. Chevron's witness testified that he met with Northwest representatives in their planning of the project and that Chevron "coordinated" with Northwest on installation of the pipeline. Internal Chevron emails show that Chevron and Northwest shared information on the location of the pipeline installation and agreed on a staging

area for construction work. There is no basis for the Court to grant summary judgment on the issue of trespass.

### 3. The 30-Inch Pipeline Was Placed Within the Footprint of the 1972 Deed Easement, Which Chevron Was Required to Protect.

As noted above, the 30-inch pipeline was located entirely within the original 1972 Easement. Chevron was therefore obligated to avoid damage to the second pipeline to the same extent as the original 26-inch pipeline. Defendants argue that language in the 1972 Deed was "exculpatory" and precludes recovery of damages for deprivation of lateral support. This argument, which is misplaced in the context of a Motion that by its terms is limited to the 30-inch pipeline, is unfounded. The provision to which Chevron refers limits liability for damages relating to removal of coal "in or underlying" the easement territory, not on adjacent parcels. As shown from the historic record referenced in the factual presentation at pages 4 and 5, above, this language must be interpreted to contemplate the risks resulting from underground mining; the historic record of mining activity in the region demonstrates that the parties were concerned about subsidence due to underground mining operations or abandoned mines. It had no relationship to surface mining, and did not in any way refer to lateral support. As a result, the type of injury suffered in this case, where Chevron stripped away land to leave a potentially unstable cliff near the pipeline easement, does not fall within the scope of any "waiver" in the 1972 Deed.

Under the 1972 Deed, Northwest's predecessor obtained the right to utilize a 60-foot permanent easement for pipeline purposes. Chevron's 1983 Special Warranty Deed was explicitly made subject to the 1972 Deed and all of Northwest's rights in the 60-foot easement. Easement holders have rights to lateral support to the same extent that surface owners do. *See, e.g.*, POWELL ON REAL PROPERTY § 63.04[1] (2011) ("A cause of action for a violation of the duty to supply lateral support exists in any persons having a possessory interest in, or a right to use, the supported land, who can prove that they have been damaged by a substantial subsidence

13

of that land."); *San Jacinto Sand Co. v. Southwestern Bell Tel. Co.*, 426 S.W.2d 338, 345 (Tex. Civ. App. 1968) ("the owner of the dominant estate, the easement owner, is entitled to lateral and subjacent support for its easements, its lines and its property lawfully thereon[.]"); *East Ohio Gas Co. v. James Bros. Coal Co.*, 85 N.E.2d 816 (Ohio Ct. Comm. Pleas 1948) (enjoining mining operations by fee owner that would undermine lateral support for utility right-of-way). Accordingly, Northwest had rights of lateral support for the entire 60-foot easement strip, which Chevron was obligated to respect regardless of what was placed on the easement.

Additionally, even if the language in the 1972 Deed waived the right to <u>subjacent</u> support for the area directly below the easement, it did not waive or even refer to the right of lateral support. The common-law rights to lateral support and subjacent support are distinct concepts and separate property rights:

> Lateral support refers to the support land receives from adjacent land. It is to be distinguished from subjacent support, the support the surface of the land receives from underlying strata. The right to subjacent support arises when one party owns the surface of the land and another owns the strata beneath it.

*See, e.g., Keck v. Longoria*, 771 S.W.2d 808 (Ark. Ct. App. 1989) (internal quotation omitted); *see also Finley v. Teeter Stone, Inc.*, 248 A.2d 106, 115 (Md. 1968) ("it is important to keep in mind the distinction between lateral support and subjacent support"); Restatement (Second) of Torts, Ch. 39, Introductory Note ("Support is lateral when the supported and supporting lands are divided by a vertical plane. Support is subjacent when the supported land is above and the supporting land is beneath it. This is the situation when one person owns an upper stratum of land and another person owns a stratum under it.").

While the right to lateral support may be waived, the "language of the deed and the circumstances surrounding the conveyance [must] show a clear intention . . . to waive such support." *See Antco, Inc. v. Dodge Fuel Corp.*, 550 S.E.2d 622, 630 (W. Va. 2001) (referring to waivers of "subjacent or lateral support). Chevron has offered no argument as to how the

language in the 1972 Deed could be construed to be a knowing waiver of the right to <u>lateral</u> support, and in fact it cannot.

The Defendants also have not offered any basis for differentiating between the 26-inch pipeline and the 30-inch pipeline in relation to their statutory obligation to avoid damage and disruption. The two parallel pipelines operate in tandem to provide a sufficient volume of uninterrupted service to the more than nine million people who depend on Northwest's gas transmission system. A disaster that disables one of the pipelines would likely disable the other and would, in any event, leave Northwest with inadequate transmission capacity to meet the demands of its customers.

Since both of Northwest's pipelines are located within the 60-foot easement, Chevron had the obligation to refrain from operations that would impair lateral support for the 60-foot easement. It clearly violated this obligation and is therefore liable for resulting damages.

## **CONCLUSION**

The Motion is untimely. It lacks any evidentiary support for the conclusory assertion that the second pipeline was placed "without permission," which is a necessary element to establish the claim of trespass. It fails to identify any reason why Chevron's disregard for the easement area conveyed in the 1972 Deed should not subject it to liability for damages associated with both the 26-inch and 30-inch pipelines located within its territory. For these reasons, the Motion should be denied.

DATED this 3rd day of September, 2013.

       /s/Paul J. Hickey
Paul J. Hickey (WY# 5-1431)
HICKEY & EVANS, LLP
1800 Carey Ave., Suite 700
P.O. Drawer 467
Cheyenne, WY 82003-0467
Facsimile: (307) 638-7335
phickey@hickeyevans.com

Alan L. Sullivan (*Pro Hac Vice* Pending)
Jared C. Fields (*Pro Hac Vice* Pending)
Snell & Wilmer LLP
15 West South Temple, Suite 1200
Gateway Tower West
Salt Lake City, Utah 84101
Telephone: (801) 257-1900
Facsimile: (801) 257-1800
asullivan@swlaw.com
jfields@swlaw.com

**ATTORNEYS FOR PLAINTIFF**
**NORTHWEST PIPELINE GP**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 3rd day of September, 2013, I electronically filed the foregoing PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING PLAINTIFF'S DAMAGES RELATING TO THE 30-INCH PIPELINE with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:

| | |
|---|---|
| Robert C. Jarosh | Bobbee J. Musgrave |
| Kara L. Ellsbury | Steven J. Perfrement |
| Hirst Appelgate, LLP | Craig K. Schuenemann |
| 1720 Carey Avenue, Suite 400 | Bryan Cave HRO |
| P. O. Box 1083 | 1700 Lincoln Avenue, Suite 4100 |
| Cheyenne, WY 82003-1083 | Denver, Colorado 80203 |
| rjarosh@hirstapplegate.com | |
| kellsbury@hirstapplegate.com | |

       /s/ Cecilia Gutierrez
Hickey & Evans, LLP

16

17843895.1